UNITED STATES of America,
Plaintiff-Appellee,

v.

Jesus E. CORTEZ, a/k/a Jesus E. Cortez-Espinoza, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Pedro HERNANDEZ–LOERA,
Defendant-Appellant.

Nos. 77–1987, 77–1951.

United States Court of Appeals,
Ninth Circuit.

April 19, 1979.

---

Tom O'Toole, Tucson, Ariz., for defendants-appellants.

Michael D. Hawkins, Tucson, Ariz., for plaintiff-appellee.

Before CHAMBERS and HUG, Circuit Judges, and FERGUSON *, District Judge.

HUG, Circuit Judge:

Jesus E. Cortez-Espinoza (Cortez) and Pedro Hernandez-Loera (Hernandez) appeal from convictions for knowing transportation of illegal aliens, 8 U.S.C. § 1324(a)(2), contending that the evidence used against them was the product of an illegal vehicle stop by border patrol officers and should have been suppressed. We agree and therefore reverse.

In late December, 1976, border patrol officers found, in the southern Arizona desert, human tracks suggesting that a man, wearing shoes bearing a distinctive "chevron" sole pattern, was engaged in the practice of leading aliens illegally into the United States. The officers inferred from a study of the tracks that "Chevron", as they called him, led groups of from about eight to twenty aliens across the United States-Mexican border at night, on a journey of approximately twenty-five miles on foot to a point on Highway 86 near Sells, Arizona. Highway 86 runs generally east and west between Ajo, Arizona and Tucson. The tracks stopped at the highway and did not reappear anywhere nearby, which suggested to the officers that a vehicle had picked up the aliens. The officers' studies further indicated that Chevron led his groups into Arizona on Friday, Saturday, Sunday or Monday nights, but whether he led groups every weekend they did not know. No one had actually seen Chevron or one of his groups in transit. The latest set of tracks located before the night of the instant arrest was made on the night of Saturday, January 15–16, 1977.

On the Sunday night of January 30–31, 1977, officers Gray and Evans of the border patrol were on duty in the general area. They "felt" that Chevron would lead a new group that night. It was a hunch, because they had no reason to believe that Chevron operated every weekend, and there was no reason why the expedition could not have occurred on the following night.

The officers did not set up an observation point in the vicinity of the chevron tracks but instead, at about 1:00 A.M., Gray and Evans parked their patrol car about one hundred feet off the highway at a point some twenty-seven miles to the east of the place where the chevron tracks had disappeared in the past. They selected this location because they were primarily responsible for watching the Altar Valley area, where a small road joined the highway, but they believed they could also watch for Chevron's vehicle there.

Gray and Evans decided that in watching for Chevron's vehicle, they would limit their attention to certain kinds of vehicles, and within that class of vehicles, only to those vehicles which passed them travelling westward and returned approximately ninety minutes later, travelling eastward. The class included vans, campers and pickup trucks that could easily hide eight to twenty aliens without drawing attention from any law enforcement authority. The class did not include commercial-looking trucks, nor did it include station wagons or sedans, although the officers knew of the practice of secreting as many as eight aliens in the trunks or rear compartments of these vehicles.

* Honorable Warren J. Ferguson, United States District Judge for the Central District of California, sitting by designation.

The officers also admitted that they had no reason to know that the vehicle assisting Chevron would approach from, and return to, the east rather than the west. They did not explain why such a vehicle could not approach the pick-up point from one direction and then continue in the same direction. They admitted that if Chevron had led a group across the border before dark that afternoon, he and his group could have been picked up and transported eastward, past the Gray-Evans checkpoint, before the two officers parked there at 1:00 A.M. They admitted that a vehicle could have passed them, gone to Sells, a town west of the chevron tracks, for legitimate purposes and returned within the ninety-minute time frame they established.

Gray and Evans saw two vehicles in this "profile" class, both campers, travelling westward that night. Shortly after 6:00 A.M., one of the two returned, heading east. As the vehicle went by, the officers did not see anyone in the camper, and on neither occasion was the driver speeding or otherwise behaving suspiciously. The officers turned on their flashing red lights and stopped the camper. The officers stated that they would have searched every single vehicle fitting the profile as it returned from the west.

Appellant Cortez was the driver and owner of the camper. When the truck was stopped, appellant Hernandez, wearing the "chevron" shoes, was sitting in the passenger's seat. In the rear compartment of the camper were six aliens who had illegally entered the United States with Hernandez earlier in the evening.

The issue is whether under the Fourth Amendment adequate cause existed to justify the stop of the camper. The courts have recognized that brief, investigatory stops under circumstances not constituting probable cause for arrest or search are permissible for effective law enforcement. *United States v. Avalos-Ochoa,* 557 F.2d 1299, 1301 (9th Cir. 1977).

The quantum of cause necessary in such cases was established by the Supreme Court in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607

(1975). "[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country". 422 U.S. at 884, 95 S.Ct. at 2582.

■ This lesser standard is justified on the theory that the Fourth Amendment must apply to a "stop", as well as to an arrest or seizure; however, because the intrusion upon privacy is not as great, the range of unreasonable police behavior is correspondingly less broad. *United States v. Brignoni-Ponce,* 422 U.S. at 779–81, 95 S.Ct. 2574; *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ The *Brignoni-Ponce* test has often been referred to, in more general terms, as the "founded suspicion" test. *See United States v. Avalos-Ochoa,* 557 F.2d at 1301; *United States v. Rocha-Lopez,* 527 F.2d 476 (9th Cir.), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976). We will use that term. We must determine whether founded suspicion existed at the time the officers turned on the flashing red lights atop their vehicle; nothing that happened afterward can be relied upon to justify the stop. *United States v. Morrison,* 546 F.2d 319 (9th Cir. 1976); *United States v. Avalos-Ochoa,* 557 F.2d 1299.

■ Finally, we note that the ultimate question on appeal is whether the trial judge's finding that founded suspicion was present here was clearly erroneous. *United States v. Patterson,* 492 F.2d 995 (9th Cir.), *cert. denied,* 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974); *United States v. Thompson,* 558 F.2d 522 (9th Cir. 1977); *United States v. Page,* 302 F.2d 81, 85 (9th Cir. 1962) (*en banc*).

■ The founded suspicion test plainly requires balancing of the facts of the particular case, see *Brignoni-Ponce,* 422 U.S. at 884–85, 95 S.Ct. 2574, and in such circumstances we will not find absolutely controlling precedent since the facts will differ. A case from our court which is quite closely related is *United States v. Carrizoza-Gaxiola,* 523 F.2d 239 (9th Cir. 1975).

In that case, officers routinely stopped southbound vehicles in a "profile" class of automobile models thought likely to be stolen and transported from Phoenix or Tucson into Mexico. The *"profile"* was, we may say, constructed from specific, articulable facts. Nevertheless, we said: "Founded suspicion requires some reasonable ground *for singling out the person stopped* as one who was involved . . . in criminal activity". (emphasis added) (523 F.2d at 241). We pointed out that Carrizoza-Gaxiola, himself, was doing nothing suspicious. Here, too, the stop was solely a product of a profile, not of facts associated with the individual, his behavior, or the specific appearance of his vehicle.

The founded suspicion test must be read as requiring some additional fact or facts which focus suspicion on the individual or vehicle stopped. As Mr. Justice Harlan said, discussing the *Terry* standard in his concurring opinion in *Sibron v. New York,* 392 U.S. 40, 73, 88 S.Ct. 1889, 1907, 20 L.Ed.2d 917 (1968), "[T]here must be something at least in the activities *of the person* being observed or in his surroundings that affirmatively suggests *particular* criminal activity . . . ". (emphasis added) It is not enough that the officer has a hunch that criminal activity is afoot. *United States v. Torres-Urena,* 513 F.2d 540 (9th Cir. 1975).

The officers did not have a valid basis for singling out the Cortez vehicle. They saw no one in the camper. They saw nothing suspicious about the vehicle itself. They had no specific information about illegal movement of aliens in the area that night. They observed no mechanical or equipment defects in connection with the vehicle. They observed no violation of the traffic laws as in *United States v. Finnegan,* 568 F.2d 637 (9th Cir. 1977). The sole suspicious fact connected with this specific vehicle was that it passed the officers' post headed west and returned headed east, both times in the pre-dawn hours. The passage of nearly two hours' time and the fact that the vehicle could have traveled to a small town and returned within that time, both furnish far too many innocent inferences to make the officers' suspicions reasonably warranted. *See United States v. Ogilvie,* 527 F.2d 330 (9th Cir. 1975) (turning off highway and turning around).

Each appellant raises a second issue. Cortez complains of a jury instruction and Hernandez claims that his sentencing process was defective. Because of our resolution of the issue jointly raised, there is no need for us to reach these two claims.

The stop of Cortez' vehicle was a violation of the appellants' rights under the Fourth Amendment. The evidence adduced at trial was a direct product of the constitutional violation and should have been suppressed.

The convictions are reversed.

CHAMBERS, Circuit Judge, dissenting:

I find no error, much less clear error, in the district judge's conclusion that there was founded suspicion to stop this vehicle. He listened to the witnesses, obviously credited the officers' testimony, and then ruled that they acted on founded suspicion. This Court rarely interferes in a trial judge's findings as to witness credibility. In any event, I find no suggestion that the majority wish to interfere. I find nothing to indicate that the officers' testimony is not to be believed or that the officers manufactured the evidence which they said led them to suspect and to stop this vehicle. As I read the majority opinion, it is that the information which the officers had before them, and the reasonable inferences drawn from it, was insufficient as a matter of law to permit them to make this stop. I disagree.

The officers put together a series of suppositions drawn from their specialized experience in investigating alien smuggling along the Arizona border with Mexico. Each of these suppositions proved to be totally founded in fact. But the majority says that it was unfounded in law. The majority says it was a blind hunch. I call it responsible police work.

What were these suppositions? The officers testified that they knew from official reports from their colleagues, and from per-

sonal investigation on their own part, that a guide whose shoes bore a distinctive chevron design was leading groups of aliens across the border along a well-defined route. It began near the border town of San Miguel, passed through the Baboquivari Valley, and ended at an area between Mileposts 114 and 122 on Highway 86, less than 30 miles north of the border. Two weeks earlier, one of the officers had personally tracked Chevron along this route for more than 22 miles. Both officers were unquestionably well-trained as trackers. They could tell that Chevron was probably of Latin descent, that he usually led groups of from 8 to 20 aliens, and that they never meandered but proceeded by forced march in a determined manner. From this the officers drew the reasonable conclusion that Chevron was a professional and that the aliens were not mere transients. The officers knew from their experience that professional smugglers in this particular area always work at night, and Chevron's tracks indicated that he traveled at night. The officers knew that border crossings were preferably made in good weather, when the sky is clear and there is good moonlight. They also knew that Chevron preferred to travel on or near weekends.

The night in question was the first clear night after a rainy three-day period that had included a weekend. The officers' primary responsibility that night was watching the junction of Route 286, running north from Sasabe, with Route 86 at a location called "Three Points". Obviously the officers did not *know* that Chevron would be crossing that night, but both, in their experience, believed that he would attempt it that night. They therefore decided to watch not only the junction with Route 286, but also to keep watch for any vehicle or vehicles that might be used to pick up aliens from the vicinity of Mileposts 114 to 135. Their car was stationed off the road very close to Milepost 149 on Route 86, or about 27 to 35 miles east of the vicinity where Chevron was known to bring his groups.

They computed the distance to be traveled on foot by the aliens and estimated that if Chevron did not cross the border until dark, then the trip could not begin before 6 p. m. On a forced march he would arrive at the pick-up area no earlier than 2 a. m. and no later than 6 a. m. The officers therefore gave special attention to these morning hours. Furthermore, they knew that if Chevron brought a group of between 8 and 20 (which was his pattern), he would have to be met by a vehicle capable of carrying that number of people. They knew that campers were widely used for this purpose by professional smugglers; they therefore gave close attention to campers traveling on Route 86 during these hours.

The officers were, particularly on guard for vehicles traveling in a westward direction on Route 86. They obviously could not be sure that a pick-up vehicle would be traveling in that direction, but they articulated clearly their reasons for believing that this would be the direction that would be followed. On prior trips, after reaching Route 86, Chevron had always led his groups on foot along the side of the road *in an eastward direction*. From this the officers reasonably assumed that the group would be walking *toward* and not away from the pickup vehicle—and *toward* and not away from their ultimate destination. Otherwise, after an arduous, forced nighttime march of over 25 miles, they would be walking *away from* the vehicle that was coming to meet them. And they would be walking with their backs to the approaching vehicle, not facing it in a position to identify the oncoming traffic.

At about 4:30 a. m. the officers saw a yellow-green camper, with a license beginning "GN–88", traveling west on Route 86. About 20 minutes later they saw another camper (license not visible) also traveling west. They were suspicious of both. These were the only vehicles which aroused their suspicion, out of the 12 to 20 westbound vehicles that passed during those morning hours. Others did not meet the profile that they knew from experience were vehicles used to pick up smuggled aliens. They estimated that it would take about an hour and a half to drive the 27 to 35 miles to the

pick up area, find the aliens, load them, and return to Milepost 149. One hour and forty minutes later, at 6:12 a. m., the yellow-green camper reappeared at Milepost 149, now heading east. Faced with the decision of letting it pass, or stopping it to make a brief inquiry, the officers decided to stop it. The majority say they should have let it drive on.

A little must be said of the nature of the terrain in this part of Arizona. We can take judicial notice that the major east-west artery in southern Arizona is Interstate 10 which approaches Tucson from the east and then continues west to Casa Grande where it becomes Interstate 8, and continues west to Gila Bend and Yuma.

Route 86, on the other hand, is a much smaller and less traveled road forming a wide southwesterly arc from Tucson on the east to Gila Bend on the west. Leaving Tucson it heads southwest into the southern portion of the Papago Reservation and generally parallels the Mexican border. It then joins Route 85 which goes northwest to Ajo and Gila Bend. The testimony is that this is desolate desert terrain, interspersed with mountain ranges. In its less than 100 miles of length it goes through only one area of any population—the Indian village of Sells, which according to the 1970 census had a population of 750. The area south of Route 86, between the Baboquivari and La Lenza Mountains, has less than 100 scattered residents. It was through this area, notorious for alien smuggling, that Chevron was bringing his groups.

The portion of Route 86 between Milepost 149 (where the officers were located) and Mileposts 114 to 122 (where they expected Chevron to arrive) is an unpopulated area. The officers testified that there were only "a couple" of houses along this stretch of road. At least one of the officers obviously knew the local residents; he testified that he had recognized another car as belonging to a local resident.

It is not reasonable to ignore the utter loneliness of the area in question. What might be "unfounded" suspicion in a more populous area of this circuit can be very "founded" suspicion in the barren desert of border Arizona. The round trip of a non-local camper on this stretch of Route 86, between 4:30 and 6:12 a. m., could not help but arouse the suspicion of any well-trained border patrolman. It is clear that officers "may consider the characteristics of the area in which they encounter a vehicle", including its proximity to the border, traffic patterns, "and previous experience with alien traffic." *United States v. Brignoni-Ponce,* 422 U.S. 873, 884–5, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). Mere presence near the border in a notorious smuggling area, at 6:40 a. m. when traffic was "light", provided founded suspicion for the stop of a non-local vehicle in *United States v. Rocha-Lopez,* 527 F.2d 476 (9th Cir. 1976).

The majority, in my view, fails to take the terrain and the time of day properly into account. Otherwise, they would not be stating that this case "is quite closely related" to *United States v. Carrizoza-Gaxiola,* 523 F.2d 239 (9th Cir. 1975).[1] In that case, officers stopped a Ford LTD being driven by a Mexican-appearing driver, merely because they knew that Ford LTDs were popular among car thieves who sell them in Mexico. The stop was made solely on the "profile" of LTDs being susceptible of car theft. The stop in *Carrizoza-Gaxiola* was made on Interstate 19, described accurately by Judge Wallace as "a major highway between Nogales and Tucson". I have grave difficulty accepting any comparison of Interstate 19 (at time unknown) with Route 86 between 4:30 and 6:12 a. m. The majority state that the camper, on its round trip on Route 86, during these hours, might have been visiting a small town. Granted. It was possible that this camper was making a round trip to Sells; but it is hardly probable. This conduct, like that in *United States v. Kandlis,* 432 F.2d 132, 136 (9th Cir.

---

1. In *Carrizoza-Gaxiola,* this Court affirmed the district court order which granted a motion to suppress, thereby recognizing the district court's particular ability to make findings on credibility. See Judge Enright's concurrence. 523 F.2d at 241–2. Here the majority reverse the district court's order denying a motion to suppress.

1970), was "a very, very suspicious circumstance which justified further inquiry." The test is reasonable, or founded, suspicion. This does not require that the behavior in question be inconsistent with innocence. *United States v. Blackstock,* 451 F.2d 908 (9th Cir. 1970).

The mere fact of a round trip at this time of day, in this location, given the notorious reputation of the area for alien smuggling, was sufficient to support the officers' claim of founded suspicion.

But this information was clearly not the only information that these officers had. They had the further information of Chevron's modus operandi and from that information they had constructed a hypothesis as to his activities on the very night in question. Those pieces of information, even if they would not support founded suspicion when considered individually, surely supported founded suspicion when considered collectively. Each circumstance gained its significance because of its presence with the others; their combined weight added up to founded suspicion. *United States v. Avalos-Ochoa,* 557 F.2d 1299 (9th Cir. 1977); *United States v. Pulido-Sanoyo,* 580 F.2d 352 (9th Cir. 1978).

*United States v. Brignoni-Ponce,* supra, recognizes the validity of permitting an officer "to assess the facts in light of his experience in detecting illegal entry and smuggling". In this case the officers, on the basis of their experience, put together a series of clues and concluded that there was a strong possibility that Chevron would bring a group of aliens across the border on this night and hour and place, and that he would be met by a vehicle of this sort, traveling in this direction. The clues, as they analyzed them, were absolutely correct in each detail. I fail to see that suspicion, based on this sort of skillful police analysis, can be called "unfounded" within the test of *Brignoni-Ponce.* I therefore dissent.