**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jose Guadalupe MAGANA,**
**Defendant-Appellant.**

No. 84–3026.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1985.

Decided Aug. 19, 1985.

Leslie K. Baker, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Stephen R. Sady, Asst. Federal Public Defender, Portland, Or., for defendant-appellant.

Before WALLACE and SNEED, Circuit Judges, and LEGGE,[*] District Judge.

WALLACE, Circuit Judge:

The single issue raised in Magana's appeal is whether the district court properly denied his motion to suppress evidence seized by Immigration and Naturalization Service (INS) officers who stopped his pickup truck. Magana entered a conditional guilty plea to one count of aiding and abetting the transportation of illegal aliens in violation of 8 U.S.C. § 1325 and 18 U.S.C. § 2(a). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

On January 13, 1984, INS officers Fisher and Woods were traveling northbound on Interstate 5 (I–5) in separate unmarked vehicles. Just north of Eugene, Oregon, the agents observed a pickup truck enter the freeway, which then pulled alongside Fisher's van. Fisher observed three males in the front seat, including Magana, the driver, and four males sitting on the floor of the truck in the pickup bed, which was covered by a canopy. The four men in the back of the truck were sitting between the truck's cab and what appeared to be a large pile of clothing. Using a hand-held radio, Fisher requested Woods, who was traveling behind Magana's truck and Fisher's van, to take a close look at the truck in order to determine whether the occupants were illegal aliens. After Woods had made his observations, Fisher slowed his van to allow the truck to pass him in order for Fisher to make further observations.

Based on their observations, the officers concluded that it was likely that some of the truck's occupants were illegal aliens. Fisher then activated the lights on his van in order to stop Magana's vehicle. Magana continued to maintain his speed of approximately 70 miles per hour while motioning to his passengers in the rear of the truck. After Fisher activated his siren, Magana finally pulled to the shoulder and began to slow down. Prior to coming to a complete stop, two passengers in the front seat jumped from the cab, crossed I–5, and were not apprehended. Magana was identified as a permanent resident alien. The four passengers in the rear of the truck admitted their undocumented status and that they were illegally in the country.

Magana argues that the officers lacked a reasonable suspicion to stop his truck, in violation of the fourth amendment, on the basis of *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (*Brignoni-Ponce*). We must review the officers' actions to determine whether they had a reasonable suspicion or founded suspicion, *see, e.g., United States v. Rocha-Lopez,* 527 F.2d 476, 478 (9th Cir.1975), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976), that Magana's truck was carrying illegal aliens.

II

The first question pertains to the appropriate standard of review of the district

---

* Honorable Charles A. Legge, United States District Judge, Northern District of California, sitting by designation.

court's finding that the officers had a founded suspicion for stopping Magana's truck. Until recently, we reviewed findings of founded suspicion under the clearly erroneous standard. *E.g., United States v. Garcia-Nunez*, 709 F.2d 559, 561 (9th Cir. 1983) (*Garcia-Nunez*); *United States v. Huberts*, 637 F.2d 630, 635 (9th Cir.1980), *cert. denied*, 451 U.S. 975, 101 S.Ct. 2058, 68 L.Ed.2d 356 (1981) (*Huberts*); *United States v. Post*, 607 F.2d 847, 849 (9th Cir. 1979) (*Post*). Although two cases before *Garcia-Nunez* implied that the appropriate standard of review might be uncertain, *see United States v. Munoz*, 701 F.2d 1293, 1296 (9th Cir.1983); *United States v. Doe*, 701 F.2d 819, 821 (9th Cir.1983), their speculations concerning the propriety of de novo review, rather than clearly erroneous review, relied on *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106, 1108–09 (9th Cir.1976) (per curiam), which discussed the standard of review for findings of probable cause in forfeiture actions rather than findings of founded suspicion.

Recently, however, we stated in a footnote that de novo review was the proper standard in founded suspicion cases in light of *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (*McConney*). *United States v. Maybusher*, 735 F.2d 366, 371 n. 1 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985) *(Maybusher)*. Although *Maybusher* recognized that past cases used the clearly erroneous standard, we justified de novo review by invoking "the rule that a panel can reexamine the earlier decision of a three-judge panel if that earlier decision has been undermined by later overriding precedent." 735 F.2d at 371 n. 1. We stated that we saw "no reason to differentiate between intervening en banc decisions of the Ninth Circuit and decisions of the Supreme Court for this purpose." *Id.* Thus, *Maybusher* concluded that *McConney* undermined past precedent even though *McConney*'s holding was limited to the standard of review for find-

ings of exigent circumstances, not founded suspicion.

Although the validity of the proposition that an en banc opinion of our court which is not directly on point is entitled to the same degree of deference as Supreme Court opinions might be questioned, it is clear that Supreme Court opinions may sufficiently undermine prior precedent to permit a three-judge panel to reexamine an earlier decision. *E.g., Heath v. Cleary*, 708 F.2d 1376, 1378 n. 2 (9th Cir.1983). Here, the Supreme Court has spoken. Both *Huberts* and *Post* relied on *United States v. Cortez*, 595 F.2d 505, 507 (9th Cir.1979), which was subsequently reversed by the Supreme Court. 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (*Cortez*). Although the Court disagreed with our finding that a vehicle stop of the same type at issue here was not based upon a founded suspicion of unlawful activity, the Court nevertheless observed that "[t]he [appeals] court also recognized that 'the ultimate question on appeal is whether the trial judge's finding that founded suspicion was present here was clearly erroneous.'" *Id.* at 416, 101 S.Ct. at 694, *quoting* 595 F.2d at 507.

■ Even if our en banc opinions may be considered as sweeping in scope as those of the Supreme Court, *Maybusher*'s holding is particularly troublesome in light of *Cortez*, to which *Maybusher* did not refer. Whether or not we characterize the Supreme Court's language in *Cortez* as dictum, that language does indicate that the appropriate standard of review is the clearly erroneous standard. We need not resolve this difficult question, however, because we find that under either standard of review, the stop of Magana's vehicle was based upon a founded suspicion of unlawful activity.

### III

■ A vehicle stop that does not occur at the border is justified only if the officers "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspi-

cion that the vehicle[ ] contain[s] aliens who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2581 (footnote omitted). In reviewing the officers' actions, "the totality of the circumstances—the whole picture—must be taken into account." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 694. Moreover, the review must be undertaken from the perspective of the officers' experience, rather than from the perspective of someone untrained in law enforcement. *See id.* at 418–19, 101 S.Ct. at 695–96; *United States v. Lomas*, 706 F.2d 886, 892 (9th Cir.1983) (*Lomas*); *United States v. Mastberg*, 503 F.2d 465, 469 (9th Cir.1974) (*Mastberg*). The observations of the officers may be cumulated in order to determine whether "the pool of objective data possessed by the group of agents acting in concert" was sufficient to meet the standard. *Lomas*, 706 F.2d at 892.

Magana argues that several of the *Brignoni-Ponce* factors were not met during the stop of his truck. He observes that the stop took place some 1,500 miles from the border, with no recent reports of border crossings. Further, he points out that the type of vehicle involved—an old pickup truck—was typical of farm vehicles in this rural area, and that although the bed of the pickup was covered by a canopy, windows in the canopy offered an unobstructed view of the passengers in the rear. Finally, he emphasizes that there was no unusual behavior manifested or evasive action undertaken by the driver until after the agents signaled him to stop. He therefore concludes that the only basis for the stop was the Hispanic appearance of the occupants, six of whom appeared to be farm workers because of their clothing, which would be insufficient under *Brignoni-Ponce*.

Magana, however, mistakes the nature of the inquiry we must undertake to determine whether the officers had a founded suspicion for the stop. Although *Brignoni-Ponce* does list several factors which may be taken into consideration in evaluating the officers' actions, *see* 422 U.S. at 884–85, 95 S.Ct. at 2581–82, the Court did not suggest that *all* these factors must be present or that other factors are irrelevant. Instead, the Court observed that *"[a]ny number* of factors may be taken into account." *Id.* at 884, 95 S.Ct. at 2581 (emphasis added). Thus, the absence of any particular factor is not necessarily determinative of the legality of the stop. Rather, we must consider whether the factors actually employed by the officers, under the totality of the circumstances, were sufficient to raise a founded suspicion for stopping the vehicle. *See Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 694–95; *see also Mastberg*, 504 F.2d at 469 (factors are not reviewed separately).

We review only the factors that were present up to the time agent Fisher signaled Magana to stop. *See Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 694–95; *United States v. Morrison*, 546 F.2d 319, 320 (9th Cir.1976) (per curiam). Although the pickup truck was of a type generally used for farm purposes, the officers emphasized that its clean appearance was noticably different from most farm vehicles, which are generally dusty or covered with mud. Moreover, the truck appeared to be equipped with helper springs and dual gas tanks, as well as covered by a canopy. According to the officers, in their experience, these characteristics are typical of vehicles employed in the transportation of illegal aliens. In addition, the out-of-state license plate indicated that the truck did not belong to any local farmer. Moreover, the back of the truck had a piece of plywood supported by the wheel wells in the middle of the truck. On top of the plywood was a pile of clothing, which obstructed the view of the passengers in the back of the truck despite the windows in the canopy, except for someone passing alongside in a higher vehicle. Although we have previously held that the cleanliness of an older automobile together with out-of-state license plates is insufficient to justify a stop, *see id.* at 321, the fact that the vehicle has characteristics common to those known to be employed in smuggling aliens is certainly relevant. *See Brignoni-Ponce*, 422 U.S.

at 885, 95 S.Ct. at 2582; *Rocha-Lopez*, 527 F.2d at 478.

The officers also considered the characteristics of the truck's occupants. All seven were males who appeared to be of Mexican ancestry. Magana, the driver, however, had an appearance distinct from the other six passengers. The officers observed that his complexion was lighter, his haircut was different, he wore different clothes (a football jersey), and his overall facial expressions suggested that he was more "Americanized," in the officers' opinion. The six passengers appeared to be farm workers, one of whom wore a hat which the officers emphasized was indicative of someone who came from the Mexican state of Jalisco. They stated that such hats, while often worn by illegal aliens, were seldom worn by anyone who had lived in the United States for very long because it would bring them to the attention of the INS. The fact that all the occupants were male also suggested a higher likelihood of unlawful status because, in the experience of these officers, alien families with citizen children are more likely to have been granted resident alien status.

■ We recognize that Mexican appearance alone will not support a founded suspicion of unlawful status. *See Brignoni-Ponce*, 422 U.S. at 885–86, 95 S.Ct. at 2582–83. Nevertheless, the Supreme Court has recognized that Mexican appearance can be considered as one factor in the determination whether to stop a vehicle: "The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor . . . ." *Id.* at 886–87, 95 S.Ct. at 2583. *See also United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *United States v. Heredia-Castillo*, 616 F.2d 1147, 1149 (9th Cir.1980). As the Court pointed out, "trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut." *Brignoni-Ponce*, 422 U.S. at 885, 95 S.Ct.

at 2582. These are precisely the factors the officers employed here.

Finally, Magana's truck was observed heading north on I–5, which is the main artery for the flow of illegal aliens during the month of January. When Wood radioed Fisher on his hand-held radio to urge him to take a closer look at the truck, Wood noticed that Magana saw him holding the radio and made eye contact with him. At that point, Magana quickly turned away. After the agents slowed down in an effort to allow Magana to pass them, Magana also slowed down for a period of time until he reached a speed of approximately 45 miles per hour, in contrast to an earlier speed of approximately 70 miles per hour, until he eventually passed the two INS vehicles. Throughout this period Magana kept an eye on Fisher's van through his rear view mirror.

To the untrained observer, these factors might not arouse any suspicion that Magana's truck harbored illegal aliens. But we must consider the situation from the perspective of two trained immigration officers, each of whom had eight years of experience. Using the data at hand, "a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. "[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *Id.* at 419, 101 S.Ct. at 696. *See also Lomas*, 706 F.2d at 892; *Mastberg*, 503 F.2d at 469.

Here, the officers observed a truck of the kind typically employed by those transporting illegal aliens, heading north on the main artery for such smuggling activities. Inside were seven occupants of Mexican appearance, six of whom were distinguishable from the driver, who appeared more "Americanized." The passengers in the rear were sitting behind what appeared to be a false bottom of plywood covered with

a pile of clothing, making them unobservable except from a high vantage point.

Here the stop was based upon " 'specific articulable facts, together with rational inferences from those facts....' " *Nicacio v. INS*, 768 F.2d 1133, 1138 (9th Cir.1985), *quoting Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582. Officers Fisher and Wood were careful to do all that they could, giving full consideration to all the information at hand, before attempting to stop the truck. On these facts, we find no error in the district court's conclusion that the stop was justified by a founded suspicion of unlawful activity, regardless of the standard of review. The mere fact that the officers' attention was drawn to Magana's truck as the result of a chance encounter far from the Mexican border does not detract from the fact of their careful, trained observations that were fully articulated at the suppression hearing.

AFFIRMED.