REVISED, October 4, 1999

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-50514

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAFAEL GUTIERREZ OROZCO,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

September 29, 1999

Before JONES, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Defendant-Appellant Rafael Gutierrez Orozco entered a conditional plea of guilty to one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841, but reserved the right to initiate the present appeal.[1] Orozco was arrested after United States Border Patrol agent Robert Bollier discovered 729.9 pounds of marijuana in the pickup truck in which Orozco was a passenger. The facts preceding Orozco's arrest are not in dispute; Orozco's sole argument on appeal is that the district court erred in denying his motion to suppress because Bollier did not have reasonable suspicion to stop Orozco's vehicle. The district court found that reasonable suspicion existed, and pointed to several facts to support its conclusion. Having examined in the aggregate the

---

[1]The court sentenced Orozco to 120 months' imprisonment and 8 years' supervised release.

facts the district court utilized to support its determination, we conclude that reasonable suspicion existed. Accordingly, we affirm.

## FACTUAL & PROCEDURAL BACKGROUND

On Sunday, May 4, 1997, agent Bollier, a 27 year veteran of the Border Patrol, was parked on Interstate 20 ("I-20") near Penwell, Texas on the lookout for illegal alien smugglers. Although dressed in full uniform, Bollier drove an unmarked patrol car with red emergency lights in its grill. Penwell is located 200-300 miles from the United States-Mexican border, and is nearby the Midland-Odessa area. On this particular stretch of I-20, the nearest large cities are El Paso and Dallas, both of which are approximately equidistant from Penwell.

At about 9:30 or 9:40 that morning, Bollier testified on direct examination, he observed a 1988 Ford "supercab" pickup truck, with what he at first believed to be three occupants, traveling east on I-20. The person in the passenger seat (later determined to be Orozco) was slumped over, while the driver was looking straight ahead. Additionally, the truck had a blue tarp pulled over the bed of the truck, and the truck was riding low. Bollier subsequently pulled out and began following the truck. He noticed that the truck was weaving back and forth across the road, suggesting to the agent that the truck was carrying a heavy load.

Bollier next pulled his patrol car up to left side of the truck, so that he was closest to the driver side. The agent then rolled down his window and honked his horn. However, the driver did not look at him.[2] Bollier also noticed that what he had thought was a third passenger in the back seat was actually a spare tire with a red jacket draped over it. Bollier testified that when the spare tire was in the back seat, there generally was something in the bed of the truck, such as illegal aliens. It was at this point that Bollier turned on his red lights and stopped the truck.

---

[2]Bollier admitted that the driver had his window down only slightly and that he might not have heard him honking the horn.

The pickup truck stopped immediately. The driver of the vehicle jumped out of the truck and started walking back to Bollier. The driver told Bollier that he was from Mexico but did not have any documents. Bollier walked up to close the truck door and saw "a large bundle" of marijuana on the back seat. Bollier then went to the passenger side of the truck and asked Orozco where he was from. Orozco stated he was also from Mexico and did not have any documents. Bollier asked Orozco what was in a white sugar sack on the back seat and Orozco replied that it was full of marijuana. Orozco also said that the back of the pickup held more marijuana. At that time, Bollier read both individuals their rights, placed them in the back seat of his vehicle, and called for assistance. A search of the truck revealed 729.9 pounds of marijuana. Bollier stated he could smell marijuana when he got into the pickup and from the bed of the pickup truck.

On cross-examination, Bollier conceded that he did not know the truck was coming from the Mexico border as there are many routes to get to Penwell, Texas. Bollier also explained that he had stopped numerous loads of aliens on that stretch of road, generally between 9:00 and 10:00 in the morning.

On September 8, 1997, the district court filed an order denying the motion to suppress. After setting forth the law in considerable detail, the court held that the stop should be treated as a roving border stop and that the factors set forth in United States v. Brignoni-Ponce, 422 U.S. 873 (1975) should apply. The factors that the court considered important in determining that Bollier had sufficient reasonable suspicion to make the stop were:

(1) his previous experience with alien traffic on this route – notably the substantial number of illegal aliens transported from El Paso to Dallas on I-20 East;

(2) the usual patterns of traffic on the particular road – here, the fact that in his experience vehicles smuggling aliens on I-20 East often passed by Penwell, Texas between 9:00 and 10:00 in the morning;

(3) aspects of the vehicle itself, particularly the heavy load of the truck, its weaving, and the tarp over the bed of the truck;

(4) behavior of the passenger – in this case, the fact that Orozco was slumped over in the passenger seat; and

(5) the behavior of the driver, specifically the fact that the driver refused to look at Bollier.

3

Giving considerable weight to Bollier's 27 years' as a Border Patrol Agent with primary duties to detect and apprehend illegal aliens through traffic checks, roving patrols, farm and ranch searches, and bus checks, the court held that the preceding facts were sufficient to provide a reasonable suspicion.

## STANDARD OF REVIEW

We employ a two-tier standard of review in evaluating a district court's denial of a motion to suppress based on an evidentiary hearing. See United States v. Wilson, 36 F.3d 1298, 1303 (5th Cir. 1994). Although the district court's findings of fact are accepted unless clearly erroneous, its ultimate conclusion as to the constitutionality of the law enforcement action is reviewed *de novo*. See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Chavez-Villarreal, 3 F.3d 124, 126 (5th Cir. 1993). We view all of the evidence introduced at the suppression hearing in the light most favorable to the prevailing party, in this case the government. See United States v. Ponce, 8 F.3d 989, 995 (5th Cir. 1993).

## DISCUSSION

Border patrol "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975); see also United States v. Inocencio, 40 F.3d 716, 722 (5th Cir. 1994) (recognizing that the Brignoni-Ponce test has been expanded to include suspicions as to any suspected criminal activity). We commonly refer to eight factors when deciding whether an agent had reasonable suspicion to stop a vehicle.

(1)      proximity of the area to the border;
(2)      known characteristics of the area;
(3)      usual traffic patterns on that road;
(4)      agent's previous experience in detecting illegal activity;
(5)      information about recent illegal trafficking in aliens or narcotics in the area;
(6)      particular aspects or characteristics of the vehicle;
(7)      behavior of the driver; and

4

(8)     the number, appearance, and behavior of the passengers.

See United States v. Samaguey, – F.3d –, 1999 WL 430752, at *2 (5th Cir. June 28, 1999)(citing United States v. Aldaco, 168 F.3d 148, 150 (5th Cir. 1999). "[R]easonable suspicion is a fact-intensive test[;] each case must be examined from the totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances." United States v. Villalobos, 161 F.3d 285, 288 (5th Cir. 1998)(internal quotation and citation omitted).

The first factor, proximity to the border, is a "paramount factor" in determining reasonable suspicion. See id.   Although we do not employ a bright line test with regard to this first factor, "a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." United States v. Jones, 149 F.3d 364, 368 (5th Cir. 1998). In this case, the stop took place some 200-300 miles away from the border. Consequently, we cannot consider this factor as cutting in favor of a finding of reasonable suspicion. See United States v. Chavez-Villareal, 3 F.3d 124, 127 (5th Cir. 1993)(350 miles from the border); United States v. Lamas, 608 F.2d 547, 548 (5th Cir. 1979) (190 miles from the border).  Moreover, we look at the remaining factors "most carefully" to ensure the stop complied with the requirements of the Fourth Amendment. See United States v. Rodriguez-Rivas, 151 F.3d 377, 380 (5th Cir. 1998).[3]

Although the stop was not within fifty miles of the border, other facts existed indicating that the particular stretch of I-20 was a favored route for illegal alien smugglers.  For instance, Bollier had personally captured approximately 20 loads of aliens in the same area over the previous five month

---

[3]The dissent urges that we are foreclosed from applying the Brignoni-Ponce factors in the instant case because the stop occurred beyond the 100-mile "reasonable distance" zone promulgated in 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1.  Although Orozco did not raise this issue below or on appeal, the dissent nonetheless argues that applying the Brignoni-Ponce factors to stops made outside the 100-mile border zone dilutes the protections afforded under the Fourth Amendment.  However, the dissent cites no cases from the Supreme Court or from our Circuit that have so held.  To the contrary, two circuits have expressly held that stops and searches made beyond the 100-mile border zone do not foreclose the application of the Brignoni-Ponce factors.  See United States v. Magana, 797 F.2d 777, 780 (9th Cir. 1986)(reject ing that stop made beyond the 100-mile zone forecloses inquiry under Brignoni-Ponce); United States v. Leyba, 627 F.2d 1059, 1065 (10th Cir.), cert.denied, 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980)(Congress did not intend to foreclose border searches beyond the 100-mile zone).

period. Accordingly, "the characteristics of the area in which [Bollier] encounter[ed the] vehicle," coupled with his previous experience with alien traffic," see Brignoni-Ponce, 422 U.S. at 884-85, justified his suspicion that the truck in which Orozco was a passenger was possibly harboring illegal aliens. See Inocencio, 40 F.3d at 723 (finding reasonable suspicion existed because the Border Patrol agent "was an experienced veteran who was familiar" with the area and had been involved in five seizures during the previous five month period).

Other facts, viewed in the light most favorable to the government, further add to the agent's reasonable suspicion. For instance, his experience taught him that the majority of smugglers passed through that particular stretch of I-20 on weekends between 9 and 10 a.m., the precise day and time in which Orozco's pickup was traveling. The truck was also traveling eastbound, the same direction that other smugglers traveled.

Furthermore, certain "[a]spects of the vehicle itself," most notably that the truck "appear[ed] to be heavily loaded," justified Bollier's reasonable suspicion. Brignoni-Ponce, 422 U.S. at 885. Bollier initially noticed that the truck bed was completely covered by a tarp, which is a common technique employed by smugglers to hide illegal aliens. He next noticed that the truck was weaving and bouncing on the road and that the tires were under inflated -- suggesting the truck bed was carrying a heavy cargo. In addition, the spare tire was placed in the back seat of the truck as if to make room for a large amount of cargo in the bed of the truck -- another trait common to illegal alien smugglers. These aspects of the vehicle, taken as as whole, further substantiated Bollier's suspicions.

The trial judge noted that the "driver's behavior" in addition to agent Bollier's observation that Orozco was "trying to hide" were factors warranting Bollier's continual pursuit of the vehicle. Id. Prior to stopping the truck, Bollier pulled next to the truck, rolled down his window to display his uniform and honked at the driver; however, this attempt to grab the driver's attention failed -- yet another sign that something was amiss. We have held that while slouching, alone, may not be a significant factor we look to overall behavior of the vehicle driver. Rodriguez-Rivas, 151 F.3d at 381. Moreover the avoidance of eye contact may or may not be entitled weight; and it is simply one factor

6

to consider in observing overall behavior.    United States v. Nichols, 142F.3d, 857, 868 (5th Cir. 1998).    Although some of the factors relied on by the trial judge would not alone amount to reasonable suspicion, reasonable suspicion determinations are not limited to analysis of one factor. Inocencio, 40 F.3d at 722; see also Nichols, 142 F.3d at 866.

Viewing these facts under the totality of the circumstances and in the light most favorable to the government as our precedent requires, we conclude that Bollier had reasonable suspicion to stop the truck in which Orozco was a passenger.

## CONCLUSION

For the reasons set forth above, we conclude that Orozco's motion to suppress was correctly denied.  Accordingly, we AFFIRM.


ENDRECORD

DENNIS, Circuit Judge, dissenting:

Because I believe that the roving border patrol stop on I-20 occurred too far from the border for the agent to have authority to make a stop without probable cause or, even if he had authority, to have had a reasonable suspicion that the vehicle was transporting undocumented aliens, I respectfully dissent.

The roving patrol stop occurred on Interstate 20, a coast to coast highway, 200 to 300 miles from the Mexican border, near Penwell, Texas, which is only about 25 miles from the Texas-New Mexico state line. Thus, the vehicle stopped was traveling on a major transcontinental traffic artery heavily used by motorists from all over the United States and from foreign countries. The place at which the vehicle was arrested was nearer to the Texas-New Mexico state line and numerous population centers in those states than it was to the external United States boundary abutting Mexico. The Border Patrol agent admitted that he could not tell whether the vehicle had come from the border rather than from towns or states within the United States.

The more serious and fundamental question of law presented is whether a Border Patrol agent has the authority, without a warrant or probable cause, to make a roving patrol stop at such a great distance from our nation's external boundaries. In United States v. Brignoni-Ponce, 422 U.S. 873 (1975), the Government contended that, in the areas adjacent to the Mexican border, the Border Patrol has authority to stop moving vehicles operated or occupied by persons of apparent Mexican ancestry and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle. The Government relied principally on 8 U.S.C. § 1357(a)(3), which, in pertinent part, authorizes agents, without a warrant, "within a reasonable distance from any external boundary of the United States, to board and search for aliens any . . . conveyance, or vehicle, . . . for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States[.]" Under the pertinent regulations, this authority could be exercised anywhere within 100 miles of the border. 8 CFR § 287.1(a)(1975).

8

But the Supreme Court held that, because no act of Congress can authorize a violation of the Constitution, it must decide "whether the Fourth Amendment allows such random vehicle stops in the border areas." United States v. Brignoni-Ponce, 422 U.S. 873, 877-878 (1975) (citing Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973)). The Court weighed (a) the valid public interest in effective measures to prevent the illegal entry of aliens at the Mexican border, against (b) the interference with individual liberty that results when an officer stops an automobile and questions its occupants, and concluded that the Fourth Amendment required the Court "to limit exercise of the authority granted by both [8 U.S.C. § 1357(a)(1) and § 1357 (a)(3)]." Id. at 884. Specifically, the Court limited the Border Patrol's statutory and regulatory authority to make roving patrol stops within the border area as follows: "In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government. . . . Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." Id. at 882 and 884.

In the case of Brignoni-Ponce, the officers had relied on a single factor to justify stopping his car near a closed fixed checkpoint south of San Clemente: the apparent Mexican ancestry of the occupants. The Court held that, although Mexican appearance may be a relevant factor, it in itself does not justify stopping all persons of Mexican ancestry to ask if they are aliens. The Court stated:

> We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens. At best the officers had only a fleeting glimpse of the persons in the moving car, illuminated by headlights. Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The

9

likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.

Id. at 886-887.

As I read Brignoni-Ponce, the Supreme Court's authorization of roving Border Patrol stops on the basis of reasonable suspicion is limited to such stops within the 100 mile border zone created by 8 U.S.C. §1357(a)(3) and 8 CFR 287.1. It would be unreasonable to assume that the Supreme Court meant to dilute the protections of the Fourth Amendment so as to authorize the Border Patrol to make suspicion-based roving patrol stops anywhere in the United States. The Court's opinion indicates no such intention. The Court said that the effect of its opinion was to place limits on the Border Patrol's statutory and regulatory authority to make vehicle stops for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. The statutory authority itself, 8 U.S.C. § 1357(a)(3) is limited to "a reasonable distance from any external boundary of the United States." "Reasonable distance" was and still is defined by 8 CFR 287.1(a)(2), for purposes of automobile stops, as "100 air miles from any external boundary of the United States or any shorter distance which may be fixed by the district director . . . ." Throughout its opinion, the Brignoni-Ponce Court limited its holding repeatedly to the "border area," referring to the area "within 100 air miles of the 2,000-mile border." Id. at 882-83. Thus, it is clear that the stop in the present case did not occur within a reasonable distance from any external boundary of the United States and, therefore was contrary to both the authority granted by 8 U.S.C. § 1357(a)(3) and the safeguard of the Fourth Amendment. Accordingly, it is evident that the seizure in this case was both unlawful and unconstitutional because the agent did not have probable cause to believe that the defendant was violating the immigration laws.[4] Cf. United States v. Venzor-Castillo, 991 F.2d 634, 637 n.3 (10th

---

[4] I respectfully disagree with footnote three of the majority opinion. (i) I do not agree that two circuits have expressly held that stops and searches made beyond the 100-mile border zone do not foreclose the application of the Brignoni-Ponce factors. As I read Unites States v. Magana, 797 F.2d 777, 780 (9th Cir. 1986) and United States v. Leyba, 627 F.2d 1055, 1059 (10th Cir.), cert. denied,

10

Cir. 1993) (acknowledging that in <u>Brignoni-Ponce</u> the Supreme Court seems to have assumed that the 100 air mile limit in the administrative regulation is a barrier that Border Patrol officers cannot cross, but not reaching that issue since the distance of 235 miles from the Mexican border was unreasonable in any case).

Additionally, even if we were to make the unwarranted assumption that this court can expand the Border Patrol's authority to make suspicion-based stops within the 100 mile border zone granted by Congress in 8 U.S.C. § 1357(a)(3), and as defined by 8 CFR 287.1(a)(2) and the Supreme Court in <u>Brignoni-Ponce</u>, there was no basis for a reasonable suspicion that the defendant was transporting undocumented aliens in the present case. When an immigration stop is not based on probable cause, but purportedly on reasonable suspicion, the distance from the border becomes critical if the circumstances will not permit a reasonable presumption that the traveler came from beyond the international border. See <u>United States v. Melendez-Gonzalez</u>, 727 F.2d 407, 411 (5th Cir. 1984); <u>United States V. Lamas</u>, 608 F.2d 547, 549 (5th Cir. 1979). The fact that the defendant in the present case could have entered I-20 from any one of the numerous towns and cities between the nearest point of entry on the border and the point of the stop, coupled with the equally plausible fact that he could have come from a neighboring state, substantially inhibits a belief that the defendant and his

---

449 U.S. 987 (1980), neither held, expressly or otherwise, that the <u>Brignoni-Ponce</u> factors apply to all stops and searches without regard to the "reasonable distance" limitation in 8 U.S.C. § 1357(a)(3), defined by 8 CFR 287.1 as "100 air miles from any external boundary of the United States." As the <u>Magana</u> court never referred to these statutory and regulatory provisions, I agree with the Tenth Circuit that "[a] careful reading of the opinion [] makes clear the court did not consider the legislative limitation of reasonableness set forth in § 1357(a)(3) [and I am] not persuaded, therefore, that <u>Magana</u> is valuable precedent for the problem we face." <u>United States v. Venzor-Castillo</u>, 991 F.2d 634, 639 (10th Cir. 1993). On the other hand, the <u>Leyba</u> court found that the stop occurred within 100 air miles from the United States-Mexican border and that the defendant did not contend otherwise, necessarily relegating to mere dicta any conflicting interpretation or application of these "reasonable distance" provisions within the context of <u>Brignoni-Ponce</u>. See <u>Leyba</u>, 627 F.2d at 1065. (ii) Because application of the <u>Brignoni-Ponce</u> factors to stops outside the 100 air-mile border zone conflicts with the Supreme Court's opinion in <u>Brignoni-Ponce</u> itself, I do not agree that this dissent cites no Supreme Court precedent in support of this contention; (iii) nor do I agree that Orozco failed to raise the issue below given that he relies heavily upon <u>Brignoni-Ponce</u> to demonstrate the violation of his Fourth Amendment protections against unreasonable seizure.

11

passenger had recently crossed the Mexican border. As a consequence, each of the other ambiguous factors relied upon by the Border Patrol agent accordingly are diminished in their ability to serve as a basis for reasonable suspicion.

The Border Patrol agent evidently first focused his attention on the defendant and his companion simply because they appeared to be of Mexican ancestry. However, "[t]he likelihood that any given person of Mexican ancestry is an alien . . . standing alone [] does not justify stopping all Mexican-Americans to ask if they are aliens." Brignoni- Ponce, 422 U.S. at 886-887. Even if the likelihood might increase with the number of Mexican-Americans involved, a proposition which has not been approved by the Supreme Court, the only area of the vehicle in which a number of undocumented aliens could have been hidden was in the tarpaulin-sealed truck cargo bed. The absence of air-holes or other ventilation, however, made it highly unlikely that any persons were concealed there during a six or seven hour drive from the Mexican border through West Texas on a hot day in May. Under these circumstances, the ambiguous facts reported by the agent--e.g., a truck with a heavy load or weak springs, a driver who disregarded a man in an unmarked automobile, a slumping or sleeping passenger, and a spare tire in the back seat (where it could be locked up)--did not provide a basis for a reasonable suspicion that aliens were secreted in the truck bed.

Consequently, I believe the roving patrol stop in this case was unlawful because it was not authorized by 8 U.S.C. § 1357 (a)(3), 8 CFR 287.1, or the Constitution as interpreted by the Supreme Court in Brignoni-Ponce and, alternatively, because there was no basis for a reasonable suspicion that the defendant and his companion had entered or transported others into the country illegally.